## Greiner's Estate.

A surety who has paid the bond debt of his principal will be placed in the situation of the creditor, and be entitled to all his rights; but not so with regard to a payment by one joint obligor in a bond; his claim against his co-obligor is a simple contract claim for contribution.

A and B " are held and firmly bound to M in the sum of 1000 dollars, to be paid to the said M, his executors, administrators or assigns; to which payment, well and truly to be made and done, we bind ourselves jointly, and our heirs, executors and administrators, and every of them firmly by these presents:" held to be a joint obligation, and not joint and several.

If an executor, in the regular discharge of his duty, advances money of his own to discharge debts of the estate, he will stand in the place of the creditors

[Greiner's Estate.]

thus paid as to the distribution of the estate. But if his course of administration has been irregular, and without regard to the rights of the creditors generally, as where he pays simple contract debts when there are specialties, he has no claim to preference on a deficiency of assets.

APPEAL from the orphan's court of *Northumberland* county.

Jacob Yoder and Martin Price were executors of Frederick Greiner deceased; and in January 1820, settled an account, charging themselves with the sum of 14,086 dollars 99 cents, and asking credits for various payments and bonds not due. Among these payments, the dates of which were not stated, were upwards of 900 dollars for simple contract debts. In November 1823, Price having died, Yoder settled a second account, charging himself with 6889 dollars 44 cents, and taking credit for payments and debts not due, showing a balance in his favour of 50 dollars: of these payments 484 dollars were simple contract debts. In April 1826, he was cited to settle a final account, and in 1827 he filed an account containing no charge, but claiming a credit for further payments and commissions, amounting altogether to the sum of 747 dollars 2 cents. In June 1829 Yoder was dismissed for not giving security according to the order of the court, and Peter Lazarus was appointed administrator *de bonis non cum testamento annexo*, and received some assets. Auditors were appointed to apportion these assets among the creditors, there being insufficient to pay all. They reported the amount of assets to be 600 dollars, and directed them to be paid as follows.

| | |
|---|--:|
| Expenses of administration and audit, . | $ 91 56 |
| Klingman for Welsten, debt on bond, . | 168 16 |
| Costs in the suit, . . . . | 13 98 |
| Klingman for Brower, debt on bond, . | 110 40 |
| Costs on same—two suits till judgment, . | 27 28 |
| Philip Greiner's judgment—action on the case, being the only simple contract debt—the balance, . . . . . | 188 62 |
| | $600 00 |

Jacob Yoder claimed the whole sum, before the auditors, as belonging to him: but they disallowed it.

Exceptions to this report were taken in the orphan's court. On a case stated, the court decided that Philip Greiner was a specialty creditor; but then decreed that Yoder was entitled to the money in the administrator's hands, in payment of his debt against the estate of 747 dollars 2 cents. From this decree the other claimants appealed.

Suit was instituted against Frederick Greiner's executors on the two bonds to Klingman for the use of Brower in August 1818, and judgments were rendered thereon in January and August 1819. On the bond to Klingman for the use of Welsten, suit was brought against the executors in April 1819, and judgment obtained in January 1820.

[Greiner's Estate.]

The claim of Philip Greiner arose thus.  On the 20th of October 1813, Frederick Greiner, the testator, and his father Philip Greiner, gave their bond to John Miller, in the sum of 2155 dollars 40 cents, conditioned for the payment of 1777 dollars 70 cents, on the 23d of August 1814, by which they bound themselves *jointly*, and their heirs, executors, administrators and *every* of them.  Frederick Greiner paid, on the 1st of September 1816, the sum of 84 pounds 9 shillings and 10 pence, on account.  In March 1819, Philip Greiner paid 1032 dollars 27 cents, in full.  In April 1819, Philip Greiner commenced an action on the case against Frederick Greiner's executors, to recover contribution, and obtained judgment in July 1819, on which a *fieri facias* was issued and returned *nulla bona*.

*Frick* and *Bellas*, for Brower.
*Greenough*, for Greiner's Administrators.
*Merrill*, for Yoder.

The opinion of the Court was delivered by

SERGEANT, J.—The first question is, as to the character of the claim of Philip Greiner, whether it is a specialty or not : for the debts of Klingman, for the use of Brower and Welsten, are admitted to be specialties.    Philip Greiner's claim cannot be so considered.    A surety paying the bond debt of the principal, would be placed in the situation of the creditor thus paid, and entitled to all his rights; Dorsheimer *v.* Bucher, 7 *Serg. & Rawle* 9; but it is admitted that Philip was not a surety.    It is contended, however, that the bond was a joint and several bond, and therefore Frederick Greiner's estate was liable upon it.    *Toll. Exec.* 284.    The legal construction of such a bond as the one under consideration, was examined in the case of Moser *v.* Liebenguth, 1 *Rawle* 255 ; 2 *Rawle* 428, and the decision was, that it is to be construed a joint bond.    If so, the executors of Frederick Greiner were not liable on it, and Philip Greiner was bound to pay the whole as surviving obligor.    Whatever *claim* he had against Frederick Greiner's estate for contribution, must rank as a simple contract debt, growing out of matters *dehors* the instrument.

Jacob Yoder claims the sum remaining in the hands of the administrator, towards the reimbursement of moneys advanced by him in payment of the debts of the testator to a greater amount.    If the executor, in the course of the regular discharge of his duty, advances moneys out of his own purse to discharge debts, it is but just that he should stand in the place of the creditors thus paid, and enjoy their privileges.    But if he proceeds irregularly, and without regard to the rights of the creditors generally, as where he pays off simple contract debts, when there are specialties and other debts of equal degree, he has no claim to preference on a deficiency of assets.    In the present case there can be no ground to allege a want of notice ; because suits were brought in 1818 and 1819, before the settlement of the first account, and, for aught we can tell, before payment of

the debts mentioned in it ; no dates of these payments being furnished in the account. There was, then, an expenditure of 900 dollars out of funds to which the specialty creditors were first entitled, and the simple contract creditors had a claim to a proportion of the remainder. These must now be lost, if the executor is to take the fund. Between the years 1820 and 1823, there is another sum of 484 dollars applied in the same unauthorized manner.

Our laws scrupulously provide for the security of the executor, and the fair and equal distribution of the assets among creditors, according to their legal rights. By the fourteenth section of the act of 1794, it is made the duty of the executor or administrator, where there is a deficiency of assets, to apply to the orphan's court for the appointment of auditors to settle and adjust the proportions payable to the creditors; who are required to present their claims within one year after public notice, on pain of losing a dividend of the assets. This affords a complete protection against the risk of mispayments from want of notice, or otherwise : and it would seem to make it the duty of every executor to avail himself of it wherever the estate is insolvent, if he means to be secure against a charge of *devastavit*, in paying debts out of their order and proportion. The English law allows an executor to make voluntary payments, as against debts of an equal or superior degree, of which he has not due notice : otherwise it might be in the power of creditors to ruin an executor, by suppressing their debts until the assets were expended. But our act of assembly stands upon a different footing : for it places the means of guarding against hazard in the hands of the executor himself.

By the act of assembly of 1705, the order of paying debts was prescribed ; and it was enacted, that nothing in that act contained should prevent or damnify an executor or administrator for discharging the decedent's just debts, as the same should come to their knowledge, without regard to the priority of the same in payment, after the expiration of twelve months from the time of the decedent's decease. This act, though it prescribed the order of paying debts, did not provide for a *pro rata* payment, where there was a deficiency of assets. Under its operation, the executor could voluntarily pay one creditor in preference to another of equal degree, of whose debt he had not legal notice : but not in preference to a creditor of superior degree within a year, though after a year he might. But whether within the year or after, a compulsory payment could be enforced in all cases. Roberts *v.* Cay's Executors, 2 *Dall.* 260.

The act of 1794 substitutes a new and improved system. It prescribes the order of payment, and, in addition, provides for a *pro rata* payment in case of deficiency of assets, by authorizing and requiring the executor to apply for auditors, and to give notice by public advertisement. It would seem that by the present system, in case of the insolvency of the estate, neither a voluntary nor compulsory payment to one creditor of his whole debt can take place, without.

II.—3 c

[Greiner's Estate.]

defeating the provisions of the act. In Ex parte Meason, 5 *Binn.* 167, it was held, that an administrator could not, under the act of 1794, retain for his own debt in preference to creditors of equal degree, on the ground that if he could sue himself he could not recover his whole debt, but only a proportion. See also Dorsheimer *v.* Bucher, 7 *Serg. & Rawle* 9.

If, therefore, the estate be insolvent, it is the duty of the executor to withhold payment, and apply for the appointment of auditors. He is not at liberty to make voluntary payments, in contravention of the order and proportion prescribed ; and, if sued, should apply to the court to control the proceeding of the creditor : otherwise the beneficial design of the act would be frustrated. If the executor disregards this duty, and undertakes to pay at his own will and pleasure, he ought to be considered as assuming the responsibility, and liable to the creditors who may suffer by his neglect. On the other hand, when the estate is solvent, it is the right and the duty of the executor to pay off the debts as soon as possible, for the benefit of heirs and legatees, and distribute the surplus.

Decree of the court reversed, and the report of auditors confirmed.